IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

TRIOSIM CORPORATION                                              PLAINTIFF

v.                              Case No. 4:26-cv-4045

CLINT YOUNG; and
M&S RELIABILTY GROUP, LLC                                        DEFENDANTS

## ORDER

Before the Court is Plaintiff Triosim Corporation's ("Triosim") Motion for Temporary Restraining Order and Preliminary Injunction.  ECF No. 7.  The Court finds that no response is necessary to resolve one aspect of the requested relief in the instant motion. For the reasons explained below, the Court grants Triosim's request for a Temporary Restraining Order ("TRO") and delays determination of Triosim's request for a Preliminary Injunction until a hearing on the matter may be conducted.

## I. BACKGROUND

The Court derives the factual background from the allegations within Triosim's verified Complaint.  ECF No. 2 (the "Complaint").  Triosim is a Wisconsin corporation with its principal place of business is Appleton, Wisconsin.  Triosim's business involves the sale of goods and services to the pulp and paper industry.  This business includes the "manufacture, sale, distribution and service of wire mesh cloth and washer drums to the paper industry," which Triosim refers to as its "Pulp Washing Equipment Business."  Complaint at 2.   Triosim is among a small number of companies that can service pulp and paper plants during those facilities' annual maintenance shutdowns.  Triosim has invested tens of millions of dollars in developing its Pulp Washing Equipment Business and related services that it provides during those annual pulp and paper facility shutdowns.

Triosim maintains confidential information and proprietary data related to the Pulp Washing Equipment Business on a password-protected and segregated electronic database named "Triobox." Out of Triosim's approximately 700 full-time employees, approximately 50 employees have access to Triobox. The Pulp Washing Equipment Business maintenance techniques, which Triosim refers to as "Washing Equipment Maintenance Services," are of "substantial economic value because they allow Triosim to provide unique services to its paper mill customers," and are difficult to replicate without the personal knowledge of those techniques possessed by former or current Triosim employees. The processes and procedures underlying Triosim's Washing Equipment Maintenance Services are kept confidential by sequestering them in Triobox. Examples of the information underlying the Washing Equipment Maintenance Services include the drawings of various manufacturers' equipment, specific maintenance techniques, drawings of Triosim's fabricated parts and their installation procedures, information about and comparisons between supply vendors, and formal reports of inspections and maintenance of customers' equipment.

Triosim sets forth its corporate policies in an Employee Handbook ("Handbook"). New Triosim employees must sign an acknowledgment of their receipt of the Handbook and their commitment to abide by the policies within. Paragraph 10 of the Handbook consists of Triosim's policies regarding access to and protection of Triosim's confidential information, and emphasizes that confidential information should not be disclosed to persons outside of Triosim. In April 2021, Triosim hired Defendant Clint Young ("Young"). Triosim eventually promoted Young to the Regional Service Manager position, which involved supervision of sales for approximately twenty pulp and paper plants. This position permitted Young to be among the few Triosim employees to have access to Triobox, where the Washing Equipment Maintenance Services confidential

information is stored.  One of the facilities within Young's purview was the Bellerud Corporation's ("Bellerud") pulp and paper plant in Escanaba, Michigan ("Bellerud Plant").[1]  Bellerud previously awarded Triosim the contract to perform maintenance during the Bellerud Plant's annual maintenance shutdowns in 2022, 2023, 2024, and 2025.  Triosim expected to be awarded the same maintenance contract for the Bellerud Plant's annual maintenance set to commence in July 2026.  Triosim entrusted Young with representing its interests to Bellerud and provided Young with access to the confidential information within Triobox to assist in Young's assignment.  Young's assignment also involved a visit to the Bellerud Plant in March 2026 to represent Triosim's interests in the annual maintenance contract.

Young lives in Ashdown, Arkansas.  In the months prior to Young's visit to the Bellerud Plant in March 2026, he exchanged a series of text messages on his Triosim-issued cell phone with Colby Steed ("Steed"), who is a principal of Defendant M&S Reliability Group, LLC ("MSRG").  ECF No. 2-1 (the "Messages").  MSRG is an Arkansas limited liability company with its principal place of business in Ashdown, Arkansas.  MSRG is a smaller company than Triosim and whom Triosim has previously subcontracted for smaller tasks within its maintenance contracts.  The Messages between Young and Steed reference, among other things, Triosim's prior quotes to Bellerud for the annual maintenance services at the Bellerud Plant, Young saving information from a laptop to an external hard drive, Bellerud's requirements for new vendors, and Steed setting up an MSRG email account for Young.  On March 19, 2026, Young informed Triosim of his resignation and provided his two-weeks' notice.  On March 23, 2026, Young's supervisor informed him that he was terminated effective immediately and took possession of Young's company-issued cell phone which contained the Messages.

---

[1] Though Triosim uses "Billerud" in the instant motion, the Court uses "Bellerud" because that is how Triosim spells it in the verified Complaint.  Thus, any quoted language from the instant motion or brief may show "Billerud."

Young subsequently began working for MSRG. Sometime in April 2026, Bellerud awarded MSRG the contract for the 2026 annual maintenance at the Bellerud Plaint. On April 8, 2026, counsel for Triosim contacted Young and MSRG to demand that both delete all Triosim confidential information in their possession and abandon any projects underway that were utilizing such information. On or about May 1, 2026, counsel for Young and MSRG delivered affidavits from each affirming that neither had any of Triosim's confidential information in their possession.

On June 6, 2026, Triosim filed its verified Complaint against Defendants in this Court. Relevant to the instant motion, Triosim brings claims against Defendants for violations of the Arkansas Trade Secrets Act ("ATSA"), Arkansas Code § 4-75-601 *et seq.*, and for violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*[2] Complaint at 10-14. Triosim alleges that Defendants violated the ATSA and the DTSA by misappropriating Triosim's trade secrets, namely the Washing Equipment Maintenance Services confidential information. Triosim alleges that it owned this secret and economically valuable information, and that Defendants acquired these trade secrets through improper means and are using them to compete against Triosim. On June 18, 2026, Triosim filed the instant motion seeking a TRO and Preliminary Injunction, along with its Brief in support. ECF Nos. 7 & 8. Defendants have not made any appearance in this matter. Counsel for Triosim states that, after filing the Complaint, they alerted counsel for Defendants via email of Triosim's request for injunctive relief based upon the need to protect its trade secrets.

## II. LEGAL STANDARD

"The court may issue a preliminary injunction only on notice to the adverse party." Fed.

---

[2] The Court has subject matter jurisdiction over the DTSA claim. *See* 18 U.S.C. § 1836(c). Further, the Court finds that it has supplemental jurisdiction over Triosim's State law claims because they are part of the same case or controversy as the federal DTSA claim. *See* 28 U.S.C. § 1367(a).

R. Civ. P. 65(a)(1).  Defendants have not appeared in the matter, making the instant motion subject to the requirements for a TRO under Rule 65(b).  A Court may issue a TRO "without written or oral notice to the adverse party or its attorney only if . . . specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).  Further, the movant's attorney must "certif[y] in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B).  "[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for preliminary injunction[.]" *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 666 (8th Cir. 2022).  Granting a request for either requires a court to weigh four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on [the nonmovant]; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).  "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021).  "[T]he burden of establishing the propriety of an injunction is on the movant." *Tumey*, 27 F.4th at 664 (quoting *Turtle Island Foods*, 992 F.3d at 699).

### III. DISCUSSION

In the instant motion, Triosim alleges that Young used his access to Triobox to download Triosim's confidential information regarding its Washing Equipment Maintenance Services, transferred that information to an external drive, and provided the information to MSRG to help it obtain the Bellerud Plant contract and to aid in its execution of that contract.  Triosim alleges that

this confidential information—which it catalogues in the attached "Index" (ECF No. 7-2)—constitutes trade secrets, which necessitates a restraining order and eventual injunction to prevent wider disclosure and harm to Triosim.  Specifically, Triosim requests that the Court:

> (1) grant the Motion; (2) issue a temporary restraining order to enjoin Defendants from any  use of Triosim's trade secrets, including but not limited to all information referred to in the Index (as it is updated through the date of the Order on this Motion) and Washing Equipment Maintenance Services, in any work the Defendants undertake during the duration of the temporary restraining order, including any work for Billerud, for such a duration not to exceed twenty-eight (28) days until a hearing on Triosim's request for a preliminary injunction can be heard by this Court; and (3) preliminarily enjoin Defendants from any use of Triosim's trade secrets, ,[sic] including but not limited to information in the Index and Washing Equipment Maintenance Services, pending the trial of this civil action or other order of this Court.

ECF No. 8, p. 13-14.  The Court will evaluate Triosim's request for the TRO under the four relevant factors.

### A. Threat of Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 318-19 (8th Cir. 2009); *and see Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."). A movant's failure to show irreparable harm is an independent basis to deny a request for injunctive relief.  *Tumey*, 27 F.4th 667.

Triosim argues that it would suffer irreparable harm without the requested TRO and subsequent injunction because it would permanently lose the cultivated economic value of its trade secrets upon Defendants' use and disclosure of those secrets.  Triosim contends that the information, procedures, and techniques that were safeguarded in Triobox provided key industry insights and allowed Triosim to offer services that were superior to its competitors.  Triosim also

contends that it obviously took measures to keep its trade secrets confidential by keeping them sequestered in the password-protected Triobox which could be accessed by a select few employees.

The Court finds that this factor weighs in Triosim's favor. Under the DTSA, a trade secret is a technique, process, procedure, or something similar that the "owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value" from not being known by or "readily ascertainable" to another person through proper means. 18 U.S.C. § 1839(3). The ATSA uses a near-identical definition of trade secret. *See* Ark. Code § 4-75-601(4). The confidential information Triosim describes as being stored in Triobox is the type of "non-public information [that] has economic value because [Triosim] 'derives economic benefit' from its not being readily known or ascertainable." *Ahern Rentals, Inc. v. EquimentShare.com, Inc.*, 59 F.4th 948, 955 (8th Cir. 2023) (quoting *Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 819 (8th Cir. 2004)). The disclosure of any such trade secret may constitute irreparable harm because disclosure permanently erases its secret status. *See Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024); *and see Triosim Corp. v. Drake*, No. 4:20-cv-00395-LPR, 2020 WL 2844887, at *15-16 (E.D. Ark. 2020) (finding a threat of irreparable harm under ATSA when disclosure of trade secrets might strike a critical blow to a movant's ability to compete in its industry).

### B. Balance of Harms

For the balance of harms factor, "the key question is whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Cigna Corp.*, 103 F.4th at 1347. The purpose of the balancing "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves

forward." *Id*. (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam)).

Triosim argues that the irreparable harm it would incur from Defendants' use and disclosure of its trade secrets significantly outweighs any potential harm to Defendants being barred from using or disclosing Triosim's trade secrets. Triosim contends that Defendants are at no risk of harm from the requested TRO and injunction because they would be permitted to proceed with their normal course of business—which is one that does not use misappropriated trade secrets.

The Court finds that this factor weighs in Triosim's favor. Triosim's framing of the risks of harm to the parties is reasonable and persuasive. Triosim is at risk of losing the value of its trade secrets without the requested TRO. With such a TRO in place, Defendants should experience no change to their normal course of business. *See Baker Elec. Co-op., Inc. v. Chaske*, F.3d 1466, 1473 (8th Cir. 1994) (determining that the balancing factor supported an injunction when there was no threat of economic harm to the non-movant). The only potential impact the TRO would have on Defendants is to restrain their use of trade secrets that they should not possess.

### C. Likelihood of Success on the Merits

The probability of success on the merits is the most significant of the four factors relevant to evaluating requests for injunctive relief. *See Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) ("[T]he probability of success factor is the most significant."); *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) ("Success on the merits has been referred to as the most important of the four [injunction] factors."). "To that end, 'the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied.'" *Barrett v. Claycomb*, 705 F.3d 315, 321 (8th Cir. 2013) (quoting *CDI Energy Srvs., Inc. v. West River Pumps, Inc.,* 567 F.3d 398, 402 (8th Cir.2009)). "A movant shows a likelihood of

success on the merits when it demonstrates a 'fair chance,' not necessarily 'greater than fifty percent,' that it will ultimately prevail under applicable law." *Cigna Corp.*, 103 F.4th at 1343 (quoting *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003)).

### 1. DTSA Claim

A claim under the DTSA requires showing "the existence of a protectable trade secret and misappropriation of that trade secret." *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020); *and see* 18 U.S.C. § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."). As previously stated, a trade secret includes any "methods, techniques, processes, [or] procedures" that "the owner thereof has taken reasonable measures to keep such information secret" and which the owner "derives independent economic value" from the information being secret. 18 U.S.C. § 1839(3).

An "owner" of a trade secret is "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed[.]"    18 U.S.C. § 1839(4). "Misappropriation" means:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
> > (I) derived from or through a person who had used improper means to acquire the trade secret;

9

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I)      the trade secret was a trade secret; and

(II)      knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5).    "Improper means" under the DTSA "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]"  18 U.S.C. § 1839(6).

Triosim argues that the facts in its verified Complaint demonstrate that it is likely to succeed on the merits of its DTSA claim.  Triosim contends that the confidential information stored on Triobox regarding its Washing Equipment Maintenance Services clearly constitutes trade secrets.  Triosim explains that the information stored in Triobox—which it developed at great cost—permits it to be one of the only entities that can fully service and provide maintenance for pulp and paper plants.  Triosim further contends that the Messages between Young and Steed establish that Young conspired to take these trade secrets and share them with his future employer to the detriment of Triosim.  Triosim asserts that this is clearly a misappropriation of trade secrets through improper means because the Triosim Handbook that Young acknowledged he received required that Triosim employees refrain from disclosing Triosim's confidential information.

The Court finds that Triosim has made a sufficient showing at this stage that it is likely to succeed on the merits of its DTSA claim.  The Washing Equipment Maintenance Services information Triosim describes as being protected within Triobox appears to satisfy the DTSA

10

definition of trade secrets.  Triosim clearly took steps to keep this information secret by having it stored in a password-protected database accessible by only a portion of its employees.  Also, the knowledge, information, techniques, and procedures compiled within has value by being secret because it provides Triosim with a competitive edge in providing services to pulp and paper facilities.   Further, the Messages provided by Triosim strongly indicate that Young misappropriated these trade secrets.  The Messages potentially show that Young—through theft or violation of his duty of secrecy to Triosim—created an electronic copy of the trade secrets available to him on Triobox.  Young then provided those trade secrets to MSRG, who either encouraged or should have known of the misappropriation, to give it an advantage over Triosim in the bidding process for the Bellerud Plant contract.  Also, MSRG's continued knowledge and potential utilization of these trade secrets would diminish the competitive advantage that they provide to Triosim.  Thus, Triosim has put forth facts showing that it has trade secrets that Young and MSRG misappropriated.  *MPAY Inc.*, 970 F.3d 1016.

### 2. ATSA Claim

The ATSA is closely analogous to the DTSA.  The ATSA defines trades secrets as "information, including a formula, pattern, compilation, program, device, method, technique, or process" for which efforts are undertaken to keep secret and which "[d]erives independent economic value" from not being known or "readily ascertainable by proper means" by those who could economically benefit from its disclosure.  Ark. Code § 4-75-601(4).  Arkansas courts also look to six factors to determine whether information constitutes a trade secret:

(1) the extent to which the information is known outside the business;

(2) the extent to which the information is known by employees and others involved in the business;

(3) the extent of measures taken by appellee to guard the secrecy of the information;

(4) the value of the information to appellee and to its competitors;

(5) the amount of effort or money expended by appellee in developing the information; and,

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Wal-Mart Stores, Inc. v. P.O. Mkt., Inc.*, 66 S.W.3d 620, 630 (Ark. 2002). "Information must meet both the ATSA definition and all of the six . . . factors in order to qualify as a trade secret." *Id*. The ATSA's definitions of "misappropriation" and "improper means" are functionally identical to their definitions under the DTSA. *Compare* Ark. Code § 4-75-601(1)-(2) *with* 18 U.S.C. § 1839(5)-(6). A plaintiff is entitled to damages for actual losses caused by the misappropriation of trade secrets or for any unjust enrichment caused by the misappropriation. Ark. Code § 4-75-606.

Triosim argues that it is just as likely to prevail on the merits of its ATSA claim. Triosim contends that the information stored on Triobox meets the Arkansas statutory definition of trade secrets and also satisfies the six additional factors for consideration set forth in *P.O. Mkt., Inc*. Triosim asserts that the Washing Equipment Maintenance Services information protected on Triobox was not generally known outside of Triosim, was only accessible to a portion of Triosim's employees, was kept secret in a password-protected electronic database, provides valuable insights into the techniques and processes Triosim utilizes to have a competitive edge in its industry, cost tens of millions of dollars over numerous years to compile and refine, and would be difficult for others to acquire. Triosim then reiterates that Young, with knowledge and approval of MSRG, misappropriated these trade secrets either through theft or a breach of his duty of secrecy.

The Court finds that Triosim has also demonstrated a likelihood of success on the merits of its ATSA claim. The facts in the verified Complaint show that the Washing Equipment Maintenance Services information secured on Triobox satisfies both the statutory definition of

12

trade secrets under Arkansas Code § 4-75-601(4) and the six-factor test for establishing trade secrets outlined in *P.O. Mkt., Inc*. Further, just as the Court determined above regarding the DTSA claim, the facts in the verified Complaint show that Defendants misappropriated these trade secrets through Young's disclosure of the secrets to MSRG to aid its bid for and execution of the Bellerud Plant contract. Triosim also alleges that this misappropriation damaged it by permitting MSRG to effectively poach the Bellerud Plant contract, which Triosim would have been awarded without Defendants' misappropriation. Thus, the likelihood of success factor weighs in favor of Triosim for both the DTSA claim and the ATSA claim.

### 4. Public Interest

The public interest factor requires consideration of public policy and the societal values and interests that might be impacted by the issuance of the requested injunction. *See, e.g., Matsumoto v. Labrador*, 122 F.4th 787, 816 (9th Cir. 2024) (evaluating the requested injunction with regards to the competing public interests of protecting children and of guarding against infringement of constitutional rights); *see also Jet Midwest Grp.*, 953 F.3d at 1046 (agreeing with the district court that public interest "favored enforcing the injunction to prevent fraud.").

Triosim argues that this factor supports issuing the requested TRO because the public interest is served by protecting trade secrets, which gives businesses and entrepreneurs incentive to innovate for competitive advantage. The Court agrees. The public interest in protecting trade secrets is apparent from the Arkansas and federal statutory schemes established to protect them. *See Drake*, 2020 WL 2844887 at *17 (citing a trade secrets statute to support the determination that an injunction to protect such secrets would be in the public interest). Moreover, general interests in honest competition and fair play support enjoining parties from benefitting from the use of another's trade secrets when those secrets were obtained through treacherous or

13

unscrupulous means. Therefore, all relevant factors weighing in favor of issuing the requested TRO.

## IV. CONCLUSION

For the reasons stated above, the Court finds that Triosim's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 7) should be and is hereby **GRANTED IN PART** as to the request for a TRO but is **HELD IN ABEYANCE** as to the request for a preliminary injunction until the Court conducts a hearing on the instant motion. Pursuant to Rule 65(b), the Court finds that the requested TRO should issue because Triosim will be injured through Defendants' alleged continued use of misappropriated trade secrets and the injury is likely to be irreparable because disclosure or further use of those trade secrets would inherently eliminate their confidential nature and corresponding value. Additionally, this TRO is issued without notice to Defendants because of the imminent and ongoing threat of injury posed by any use or disclosure of Triosim's trade secrets.

Accordingly, the Court **ORDERS** as follows:

1. Defendants are hereby restrained from any use or disclosure of Triosim's Washing Equipment Maintenance Services trade secrets—as catalogued in the Index (ECF No. 7-2)—in any work Defendants undertake during the duration of this TRO, including any work for Bellerud.

2. This TRO shall expire within fourteen (14) days after entry, unless good cause is shown for an extension or the parties mutually consent to a longer extension.

3. The Court shall conduct a hearing on Triosim's request for a preliminary injunction at **10:00 a.m. on July 9, 2026**, at the United States Courthouse in Hot Springs, Arkansas.[3]

---

[3] Though this matter is in the Texarkana Division, the United States Courthouse in Texarkana, Arkansas is not available for a hearing within fourteen days because of scheduled repairs and remodeling.

14

4. As Defendants have not entered their appearance in the case, Triosim's counsel is **ORDERED** to promptly serve a true and correct copy of this Order on Defendants and their respective counsel, if known.

5. Pursuant to Rule 65(c), Triosim is **ORDERED** to post a $10,000 bond within ten (10) days of this Order to provide financial security against any damages or costs Defendants may sustain if they demonstrate that they have been wrongfully restrained.[4] Failure to provide this security shall result is the Court dissolving the TRO.

**IT IS SO ORDERED**, this 25th day of June, 2026, at 4:00 p.m. C.S.T.

/s/ Susan O. Hickey
Susan O. Hickey
Senior United States District Judge

---

[4] Because Triosim does not address the required security in its motion and the Court does not have sufficient information to evaluate what damages Defendants may incur from being wrongfully restrained, this nominal amount must suffice for now. *See* Fed. R. Civ. P. 65(c) (stating that a court may issue a TRO "*only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added).